

**IT IS ORDERED as set forth below:**

**Date: December 26, 2016**

_____
**James R. Sacca**
**U.S. Bankruptcy Court Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Peter Dominic Anzo, | ) | Case No.: 14-22766-JRS |
| | ) | |
| Debtor. | ) | |
| | ) | |
| Dallas A. Hurston, | ) | |
| | ) | Adversary Proceeding |
| Plaintiff, | ) | |
| | ) | Case No.: 15-2026-JRS |
| v. | ) | |
| | ) | |
| Peter Dominic Anzo, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

The primary issue in the trial of this adversary proceeding is whether the Plaintiff, when
he renewed a loan for more than $400,000, actually and reasonably relied on the Debtor's
personal financial statement which showed a net worth of about $12,500,000 when the Debtor's
net worth was really closer to zero, but which financial statement contained one or more known

material inaccuracies and other "red flags" and the Plaintiff did no investigation into its *bona fides*. After the Debtor filed for chapter 7 bankruptcy relief, Plaintiff filed this dischargeability action under § 523(a)(2)(B) because of the false financial statement. After the parties' cross-motions for summary judgment were denied, the matter came on for trial.

## Facts

Peter Anzo ("Mr. Anzo") formed LaPrade's Marina, LLC ("LaPrade's"),[1] which purchased LaPrade's Marina located on Lake Burton (the "Marina") in the North Georgia mountains in March 2006. Mr. Anzo was the manager and majority owner of LaPrade's. The Marina was closed at the time it was purchased, so a considerable amount of work needed to be done to reopen and improve it. Mr. Anzo had previous experience operating marinas, but he had never developed a marina before. Dallas Hurston ("Mr. Hurston") had been a longtime patron of the Marina and was an investor in the entity that sold the Marina to LaPrade's.[2] Prior to his retirement in 2000, Mr. Hurston worked for Coca Cola for thirty three years, the majority of which time he spent in the Corporate Tax Department, some as its Director, and for his last six years he was its Director of Corporate Real Estate.

### *October 2007 Note*

As opposed to the typical debtor/creditor situation where the debtor makes a request of the creditor for a loan, it was Mr. Hurston who reached out to Mr. Anzo after the Marina was purchased by LaPrade's to express interest in obtaining an equity interest in LaPrade's because he wanted to be involved in the Marina. Mr. Hurston never did obtain any equity, but the Marina did need money for capital improvements, so Mr. Hurston loaned LaPrade's $400,000,

---

[1] LaPrade's filed for Chapter 11 bankruptcy relief in this Court in 2015, case No. 15-20697. The Court may have utilized non-controversial facts from that case known to it from documents filed of record in this statement of facts to offer a more complete and accurate picture even if those facts are not necessarily material to the matter pending before the Court in this proceeding.

[2] When LaPrade's purchased the Marina, Mr. Hurston testified that he not only received repayment of the entirety of his investment of $500,000 in the prior entity, but he netted a profit of about $175,000 to $200,000.

evidenced by a promissory note dated October 25, 2007 (the "October 2007 Note").  Mr. Anzo did not provide a guaranty or a financial statement in connection with the October 2007 Note, nor was there any collateral for the loan. The October 2007 Note's maturity date was October 25, 2008, although the parties concurrently agreed in a separate letter that Mr. Hurston would agree to become an investor pursuant to a couple of proposals discussed therein, but if he did not agree to those, then the October 2007 Note would be paid off "within 90 days of your notice that you want to be paid off with interest."  Mr. Hurston testified that one of the reasons he was okay with making a loan to LaPrade's at this time was because Mr. Anzo told him the Marina was "free and clear," which the Court took to mean that he thought there was no secured debt on the Marina, although Mr. Hurston appeared to be aware that the company had debt.    No other evidence was presented regarding any due diligence Mr. Hurston did in connection with making this loan.

Mr. Hurston agreed to let Mr. Anzo draft the October 2007 Note because he did not think that a transaction of this size, $400,000, warranted the expense of paying a lawyer to document it.   The October 2007 Note was less than a page long and, in this Court's view, was more favorable to a borrower, with limited waivers, a provision that limited Mr. Hurston's attorney's fees to those that were reasonably and actually incurred and paid,[3] and included an unusual provision that provided for payments to be made at the borrower's address instead of the lender's address.

Prior to the maturity date of the October 2007 Note, Mr. Hurston reviewed two versions of a document called an Executive Investment Summary for investment in the Marina.  It is at

---

[3] Typically, lenders in Georgia include a provision in a note that provides for "reasonable attorney's fees" which, under the applicable Georgia statute, is basically 10% of the principal and interest due, or the contract often provides for costs of collection, including attorney's fees, of a flat 15% of the principal and interest due, both of which are an easy amount to prove on summary judgment or at trial rather than the factually intense issue of whether fees were actually and reasonably incurred and paid.  The fees allowed pursuant to the statutory formula can result in a larger award to the lender than what its actual and reasonable fees are depending on the amount due on the contract.

this time that he claims he first found out that Omni National Bank and H.H.E. Partnership, L.P. had secured positions on the Marina, which revelation apparently miffed him because he said he was previously told by Mr. Anzo that the Marina was "free and clear."  The Executive Investment Summaries contained conflicting information about the extent and nature of the debt on the Marina.  One version said the acquisition and construction debt was about $6,500,000 and that there had been about another $5,200,000 invested by insiders, for a total of about $11,700,000, while the other version stated the Marina had construction debt of $4,500,000, third party loans of $3,835,000 and loans from affiliates of $7,125,000, for a total of about $15,500,000, a difference of about $3,800,000.     According to e-mails and discussions in early September 2008, Mr. Anzo got the feeling that Mr. Hurston felt that "we are trying to rip him off" and, in a call to LaPrade's counsel shortly thereafter, Mr. Hurston expressed his concern that he felt that Mr. Anzo had "jerked [him] around."

At this time, LaPrade's was negotiating with one or more banks to refinance the debt it owed to its lenders, including Mr. Hurston.  These negotiations, which are referenced in the E-mails described below, were taking place in late 2008 at a time when many commentators were contending that the country's financial markets were on the verge of collapsing and the availability of commercial real estate loans was extremely limited if not almost non-existent. North Georgia, where this Marina is located, was particularly hard hit and that area was among the nation's leaders in bank failures during this time.[4]

Despite Mr. Hurston's feelings, he and Mr. Anzo discussed a potential extension or renewal of the October 2007 Note because of LaPrade's inability to pay back that note at that time.  In connection with the discussions regarding an extension, it appears from the e-mails that Mr. Anzo offered to provide a guaranty as opposed to Mr. Hurston requesting such a guaranty.

---

[4] Omni National Bank failed in March 2009.

During these discussions, the parties exchanged e-mails on or around October 10, 2008 regarding Mr. Anzo's assets (the "E-mails"). In the E-mails, Mr. Hurston inquired as to the ownership of Mr. Anzo's real estate because of language in the note about the homestead exemption. Mr. Anzo informed Mr. Hurston that his wife owned a house on Lake Burton (the "Lake House") and he and his wife jointly owned a condominium in Atlanta (the "Condo"). Mr. Hurston requested in the E-mails that if the note was not repaid in a few weeks, he "should get the same information as other non-equity lenders particularly since my position is secondary to theirs." In response to this vague request for the "same information," Mr. Anzo stated in the E-mails that the bulk of his net worth, allegedly in excess of $10,000,000, was not in his personal residences and that he would be "happy to provide you with a personal financial statement" if the Marina's loan refinancing did not close. The parties were also exchanging a document at this time called a Loan Conversion Option Agreement that would have given Mr. Hurston an option to purchase boat slips – subject to the rights of the secured creditors – upon an event of default on the note in exchange for credit against the note, with LaPrade's having an option to buy the slips back. The terms of that agreement were not finalized, though.

*October 2008 Note*

Eventually, Mr. Hurston and LaPrade's agreed to an extension, evidenced by a note dated October 29, 2008 in the principal amount of $432,000,[5] and with a maturity date of January 27, 2009 (the "October 2008 Note"). Mr. Anzo signed the October 2008 Note on behalf of LaPrade's and also, for the first time, as a guarantor, in consideration for this mere 90 day extension. There was not a separate guaranty agreement signed. The terms of the guaranty consisted of little more than Mr. Anzo signing the note in his individual capacity under the term

---

[5] Unpaid interest at the time of the renewal of the note was capitalized into the principal balance of the note rather than new money being advanced.

"Guarantor" right below where he signed the note in his corporate capacity for LaPrade's. This extension was provided after the E-mails, but without a formal financial statement. During this time, LaPrade's continued to try to refinance its debt while the country's recession deepened.

Upon his receipt of a draft of the October 2008 Note from Mr. Anzo, Mr. Hurston stated in an e-mail that "while I agree  with the current guarantee language for the 90 day period, for any further extensions I should be entitled to the data furnished any other lender including a clearly worded personal guarantee with supporting financial statements.  I would also need to complete the option agreement for the conversion to boat slips."

About a month before its maturity, Mr. Hurston sent a letter to Mr. Anzo informing him that he expected full payment upon maturity of the October 2008 Note.  In a letter dated January 21, 2009, Mr. Anzo explained to Mr. Hurston that despite his attempts to refinance, the October 2008 Note could not be repaid on its maturity date because "we will not be able to pay you off until the loan gets completed."  In the letter, Mr. Anzo included a copy of a recent appraisal of the Marina as of November 2008 obtained by a potential lender for more than $22 million,[6] which Mr. Hurston acknowledged was excessive, and advised Mr. Hurston that the Marina received permission to increase its number of slips to 196.   About the same time as he sent that letter, Mr. Anzo also provided to Mr. Hurston a document entitled "Personal Net Worth Statement of Peter D. Anzo" dated as of January 1, 2009 (the "Financial Statement").  Mr. Anzo testified that he prepared the Financial Statement on New Year's Day, probably while watching football, did not spend much time on it, did not review it carefully before he sent it, but the values in it were based on what was paid for properties or appraisals, such as in the case of

---

[6] This value opined by this appraisal was, at the very least, dubious.  The appraisal only used comparable land sales from 2005 and 2006 to support its conclusion, which years were at the height of the real estate market in North Georgia, and which sales occurred about 2 or 3 years before the date of the appraisal, with no downward adjustment for the recession, and it did not use the income approach nor any comparable marina sales.  Basically, this appraisal is a poster child for the reforms that took place in the appraisal industry as a result of the collapse of the real estate markets.

6

LaPrade's, or what a company's balance sheet showed its worth to be at the end of the second or third quarter of 2008, before the collapse of the financial markets and real estate values in the Fall of 2008.   It did not distinguish between assets owned by him or his wife.  The Financial Statement, which showed a net worth of more than $12,505,000, is discussed in more detail below.

According to the Financial Statement, Mr. Anzo's assets totaled $15,290,433, made up of: (a) $119,000 of cash on hand and in financial institutions; (b) $5,622,178 worth of stocks and bonds, almost all of which were interests in privately held companies;[7] (c) $72,500 cash value of life insurance;[8] (d) real estate worth $4,330,000;[9] (e) $4,603,825 in partnership interests;[10] (f) $255,000 in notes receivable; (g) vehicles worth $58,000;[11] and (h) miscellaneous personal property worth $229,930. It indicated his total liabilities as of January 1, 2009, were $2,785,319 and consisted only of mortgages. The Financial Statement estimated Mr. Azno's total net worth as of January 1, 2009 to be $12,505,114. Mr. Anzo signed the Financial Statement below the acknowledgment that stated "[t]his statement is given for the purpose of obtaining credit and

---

[7] The stocks and bonds included: (a) 85% interest in The Vinings Group I, LLC estimated to be worth $755,075; (b) 2,000 shares in ANTS, Inc. worth $210,000; (c) 42.5% interest in Vinings Marine Group, LLC worth $412,500; (d) 486 shares in Vinings Investment Properties Trust worth $3,888,000; (e) unspecified "Blue Chips" worth $271,603; and (f) 8500 shares in Daufuskie Ferry Co. worth $85,000.

[8] The life insurance policies with a cash value included: (a) a policy with State Farm with a cash value of $8,000; (b) a policy with Shenandoah Life with a cash value of $44,639; and (c) a policy with Protective Life with a cash value of $60,611.

[9] The real estate included: (a) a single family rental property located at 5404 Vernon Walk, Atlanta, Georgia 30327 (the "Vernon Walk Property"); (b) the Condo, located in Atlanta; and (c) the Lake House, which was his personal residence located in Clayton, Georgia.

[10] According to the Anzo Financial Statement, his partnership interests included: (a) a 15% interest in Little Creek Investment Group worth $200,000; (b) a 4.5% interest in Little River Investment Group worth $175,000; (c) an 11% interest in Willoughby Investment Group worth $55,000; (d) a 40% interest in Lake Perry Marina, LLC worth $450,000; (e) a 7.50% interest in Shallow Anchor Marina worth $90,000; (f) a 50% interest in Toledo Beach Marina, L.P. worth $140,000; (g) a 50% interest in VMG Investment Group L.P. worth $123,500; (h) a 50% interest in VMG D500, LLC worth $246,325; (i) a 50% interest in VMG GC, LLC worth $241,500; (j) a 50% interest in Point Lookout Investment Group, LP worth $123,500; (k) a 5% interest in Family Partnerships worth $59,000; and (l) a 67.5% interest in LaPrade's Marina LLC worth $2,700,000.

[11] The three vehicles were (a) a 2003 Lexus LS 430 worth $22,000; (b) a 2006 Honda Ridgeline worth $21,000; and (c) a 2003 Audi A-4 convertible worth $15,000.

constitutes the true and correct state of my financial conditions." The Financial Statement does not mention Mr. Anzo's wife nor was it signed by his wife.

As it turns out, the Financial Statement contained numerous inaccuracies. About half of the assets listed in the Financial Statement were not actually Mr. Anzo's assets in January 2009, but rather those of his wife. In particular, Mr. Anzo did not have an interest in: (a) the personal property; (b) unspecified blue chips; (c) Little Creek Investment Group; (d) Little River Investment Group; (e) Willoughby Investment Group; (f) Lake Perry Marina, LLC; (g) Shallow Anchor Marina; (h) VMG Investment Group, L.P.; (i) VMG DSOO, LLC; (j) VMG GC, LLC; (k) the Family Partnerships; (l) the Lake House; and (m) half of the Condo. He also only had a partial interest in other assets included in the Financial Statement. In addition, the Financial Statement omitted almost $10 million worth of contingent liabilities from personal guaranties.

As previously noted, included on the Financial Statement were the Lake House that Mr. Anzo had told Mr. Hurston was not in his name, but the name of his wife, valued on the statement at $2,100,000, and the Condo valued on the Financial Statement at $1,300,000 that he had previously told Mr. Hurston he owned jointly with his wife, nor was his contingent liability to Mr. Hurston or any other lender disclosed. Even though Mr. Hurston knew of these inaccuracies, he did not raise them with Mr. Anzo at the time. Mr. Hurston did not seek to have Mr. Anzo clarify or reaffirm the ownership of assets, nor did he request from Mr. Anzo any personal tax returns, property deeds, bank account or investment account records, loan documents, credit reports, or any information regarding the private entities, interests in which were included as assets in the Financial Statement, or any other financial information or documents about his personal financial condition.

8

*January 2009 Note*

Thereafter, the parties agreed to a new note dated January 28, 2009 in the principal amount of $444,782,[12] with a maturity date of April 28, 2009 (the "January 2009 Note"), which repaid the prior note. Mr. Anzo again signed this note as guarantor in the same form as the prior note as opposed to something that was "more clearly worded" as Mr. Hurston had previously requested. In this January 2009 Note, LaPrade's did commit to providing Mr. Hurston with an Option Agreement which would give him the right to convert the amount due into long-term boat slip leases, but if the Option Agreement was not provided by April 1, 2009, the note would be due and payable at that time.

In the interim, LaPrade's principal secured lender, Omni National Bank, failed in March 2009. The January 2009 Note was not paid off on its maturity date. On May 23, 2009, Mr. Hurston sent a letter to Mr. Anzo and LaPrade's declaring a default on the January 2009 Note and demanding payment or he would pursue other collection remedies (the "May Default Letter"). Mr. Anzo responded to the May Default Letter with his own letter dated May 28, 2009, wherein he offered, "as a compromise to avoid litigation," paying monthly payments of $5,559.78 on the amount due for an additional six month extension of the loan while Mr. Anzo continued to try to get new financing. Mr. Anzo asked Mr. Hurston to "consider this option as it is the only viable solution at this time."

Mr. Hurston retained a lawyer in April or May 2009 to review his position against LaPrade's and Mr. Anzo. Mr. Hurston provided his attorney with the January 2009 Note and the Financial Statement, but he did not inform his lawyer about the material discrepancies in the Financial Statement that he knew about.

---

[12] Once again, unpaid interest at the time of the renewal of the note was capitalized into the principal balance of the new note rather than new money being advanced.

*June 2009 Note*

After the May Default Letter and Mr. Anzo's response, the parties discussed an extension of the January 2009 Note, and eventually, in June 2009, they agreed to another extension, effective as of April 29, 2009, evidenced by a note in the principal amount of $461,233, with a maturity date of October 28, 2009 (the "June 2009 Note").[13]  The terms of the extension were basically along the lines proposed by Mr. Anzo in his response to the May Default Letter. Because Mr. Hurston was now represented by counsel, the June 2009 Note was in the form one would expect to see when drafted by a lawyer on behalf of the lender, one that was favorable to the lender as opposed to one that was more favorable to the borrower like the prior notes.   In connection with the June 2009 Note, Mr. Anzo signed a separate guaranty agreement which was also effective as of April 29, 2009 (the "Guaranty Agreement"). The Guaranty Agreement, too, was in the form one would expect to see when drafted by a lawyer on behalf of the lender, one that was favorable to the lender - as opposed to one that was more favorable to the borrower like the prior "Guarantor" endorsement on the notes - specifying what was being guaranteed, with waivers, and a reaffirmation of any financial statements provided.

Although Mr. Hurston alleges that he relied heavily on the Financial Statement when deciding whether to extend the January 2009 Note in June 2009, and that he would have filed suit immediately if he had known that Mr. Anzo's net worth was less than what was represented, both he and his lawyer testified that the January 2009 Note was extended so Mr. Hurston could get a "real note and guaranty."

---

[13] The June 2009 Note was signed in June 2009 "as of" April 29, 2009, to coincide with the maturity date of the January 2009 Note.  Once again, unpaid interest at the time of the renewal of the note was capitalized into the principal balance as of the date of the new note rather than new money being advanced and LaPrade's paid Mr. Hurston the two months' worth of interest upon the execution of the new note.

Mr. Hurston did not request either a new or updated financial statement from Mr. Anzo prior to the execution of the June 2009 Note, nor did Mr. Hurston ask Mr. Anzo any questions about the one he had provided, but Mr. Hurston contends that he had no reason to suspect Mr. Anzo's financial condition changed in any material way since receiving the Financial Statement in January 2009 until the note was extended in June 2009, despite the deep recession the country was in and Mr. Anzo's further request for an extension of time to pay because he did not have the ability to pay, in part because he contended that Mr. Anzo continued to maintain a lavish lifestyle. This alleged lavish lifestyle, which Mr. Anzo disputed, appeared to be based on the Lake House in which Mr. Anzo lived and that he supposedly drove nice cars, wore nice clothes, frequently ate at the restaurant at the Marina, and used an undescribed yacht.[14]

The June 2009 Note was not paid in full by its maturity date. Sometime thereafter, Mr. Hurston made a demand for payment and then filed suit in the State Court of Cobb County against LaPrade's and Mr. Anzo. He received a judgment against LaPrade's and Mr. Anzo, jointly and severally, in the amount of $626,825.48, on November 8, 2010 and recorded the judgment.

On November 25, 2014, Mr. Anzo filed for chapter 7 bankruptcy relief. Mr. Hurston timely filed the present adversary proceeding seeking to have his debt declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) and recover attorneys' fees and expenses. The Court previously denied the parties' cross motions for summary judgment, but it did narrow the issues for trial by finding that Mr. Hurston's claims were not barred by the Georgia statute of limitations for fraud, that the Financial Statement was a materially false statement in writing

---

[14] Mr. Anzo disputed that he led a lavish lifestyle. He claims his cars were not new, but rather a Lexus and Audi, both of which were six years old, and a three year old Honda Ridgeline, he typically wore clothes in which he could get dirty because he worked at the Marina, often ate at the restaurant at the Marina because of the convenience and the discount he got there and he had access to lots of boats.

regarding Mr. Anzo's financial condition and that it was not stale by the time of the June 2009 Note. The Court also found that Mr. Hurston did not have to show damages from the extension or renewal of the loan.[15] The Court's reasoning on these issues is set forth in its Order denying the cross motions for summary judgment and will not be repeated herein, but rather is incorporated herein by reference. (Doc. 64). Consequently, the issues tried before the Court were whether Mr. Hurston actually and reasonably relied on the Financial Statement in renewing the loan and whether Mr. Anzo intended to deceive Mr. Hurston when he delivered the Financial Statement to him. The Court's discussion of those issues follows.

### Discussion

The creditor objecting to dischargeability has the burden of proving by a preponderance of the evidence that a debt is non-dischargeable. *Equitable Bank v. Miller* (*In re Miller*), 39 F.3d 301, 304 (11th Cir. 1994). When objecting to dischargeability of a debt under § 523(a)(2)(B), the creditor must prove each individual element required by § 523(a)(2)(B) or the entire debt is dischargeable. *Id.* "[C]ourts generally construe the statutory exceptions to discharge in bankruptcy 'liberally in favor of the debtor,' and recognize that 'the reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural.'" *Id.* (citations omitted). "This narrow construction ensures that 'the honest but unfortunate debtor' is afforded a fresh start." *Id.* (citations omitted).

---

[15] Although the Court previously held that the Financial Statement was not stale and that Mr. Hurston did not have to show damages on account of the extension of the loan, it also held that the timing of the Financial Statement and the reaffirmation of it, and the potential lack of any damages from the extension of the loan could be relevant to the issue of actual and reasonable reliance on it with respect to the extension of the note.

Pursuant to § 523(a)(2)(B), a debt is excepted from discharge if it is

> (2) for money, property services, or an extension, renewal, or refinancing of credit, to the extent [it was] obtained by [the]
>
> . . . .
>
> > (B) use of a statement in writing—
> > > (i) that is materially false;
> > > (ii) respecting the debtor's or an insider's financial condition;
> > > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > > (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). In order for its debt to be declared non-dischargeable under § 523(a)(2)(B), a creditor must prove by a preponderance of the evidence that the debtor obtained money, property, or the extension of credit through the use of: (1) a written statement; (2) the written statement was materially false; (3) the written statement concerns the debtor's financial condition; (4) the plaintiff reasonably relied on the statement; and (5) the debtor published the writing with the intent to deceive the plaintiff. *Bank of N. Ga. v. McDowell* (*In re McDowell*), 497 B.R. 363, 369 (Bankr. N.D. Ga. 2013).

### 1. Actual and Reasonable Reliance

For a debt to be non-dischargeable pursuant to § 523(a)(2)(B), the creditor's reliance must have been both actual and reasonable. First a creditor must actually rely on the false statement; if the reliance would have been reasonable, but there is no actual reliance, § 523(a)(2)(B) is not satisfied. *Mountain Valley Cmty. Bank v. Freeman (In re Freeman)*, 469 B.R. 128, 131 (Bankr. M.D. Ga. 2012). While actual reliance is difficult to prove, it can be established by circumstantial evidence. *First Nat'l Bank v. Cribbs* (*In re Cribbs*), 327 B.R. 668, 674 (B.A.P. 10th Cir. 2005). A financial statement does not have to be the only factor influencing a creditor; partial reliance is all that is needed. *First Commercial Bank v. Robinson*

(*In re Robinson*), 192 B.R. 569, 576 (Bankr. N.D. Ala. 1996). Partial reliance does, however, require a showing that the financial statement was a substantial cause for providing or extending credit. *See Colo. E. Bank & Tr. Co. v. McCarthy* (*In re McCarthy*), 421 B.R. 550, 561-61 (Bankr. D. Colo. 2009); *Barclays American/Business Credit, Inc. v. Long* (*In re Long*), 44 B.R. 300, 309 (Bankr. D. Minn. 1983).

A creditor generally cannot claim that he actually relied on a financial statement when the creditor is aware of material inaccuracies on the statement, yet still extends credit. *First Nat'l Bank of Stuttgart, Ark. v. Owens* (*In re Owens*), 322 B.R. 411, 421 (Bankr. E.D. Ark. 2005) ("Clearly, [the creditor] knew of the existing but undisclosed [] indebtedness; therefore, he did not actually rely on the financial statement as to these obligations."); *see also RBC Bank (USA) v. Hoefling* (*In re Hoefling*), No. 09-2669, 2011 WL 2118226, at *6 (Bankr. D.N.J. May 23, 2011) (finding no actual reliance when the creditor was aware of incorrect information listed in financial statement, indicating the creditor did not rely on the statement provided). Courts can infer that a creditor did not rely on the financial statement when the creditor takes no action upon receiving an insufficient financial statement. *Kelly et al. v. Merrill* (*In re Merrill*), No. 12-01111, 2014 WL 1244791, at *6 (B.A.P. 9th Cir. Mar. 26, 2014). Additionally, just because a creditor actually relies on the initial financial statement provided does not necessarily mean the creditor relied on subsequent financial statements to extend the credit. *See, e.g.*, *Bank One of Wapakoneta, NA v. Huffman* (*In re Huffman*), 45 B.R. 590, 594 (Bankr. N.D. Ohio 1984) (finding the creditor did not rely on subsequent financial statements because the original statement involved the most thorough credit check, and reliance on subsequent statements would have only occurred if debtor's income changed).

"The reasonable reliance analysis is done on a case-by-case basis considering the totality of circumstances." *In re McDowell*, 497 B.R. at 370. In looking at the totality of the

14

circumstances, a court should consider whether: (1) the creditor followed its established lending procedure in renewing the loan application; (2) the creditor verified the financial statements through outside sources; (3) even minimal investigation would have revealed the inaccuracy of the debtor's representations; (4) the creditor had previous or close personal relationship or friendship with the debtor; (5) the financial statements contained any "red flags" that should have alerted the creditor to potential inaccuracies; and (6) whether the debt was incurred for personal or commercial reasons.[16] *Id.* at 371; *Navy Fed. Credit Union v. Purse* (*In re Purse*), 537 B.R. 28, 39 (Bankr. S.D. Ga. 2015). "[R]easonable reliance connotes the use of the standard of ordinary and average person." *Davenport v. Frontier Bank* (*In re Davenport*), 508 F. App'x 937, 938 (11th Cir. 2013) (unpublished). It is a more stringent standard than justifiable reliance or actual reliance. *City Bank & Trust Co. v. Vann* (*In re Vann*), 67 F.3d 277, 280 (11th Cir. 1995).

The parties dispute whether the substance of the Financial Statement was a material part of the extension that was agreed upon or whether the Financial Statement was merely something that Mr. Hurston just wanted to have for his file because he said he wanted the type of information other lenders received, which included a financial statement. Mr. Anzo argues that any reliance on the Financial Statement was not reasonable because Mr. Hurston knew of at least some of the inaccuracies in the Financial Statement from the E-mails the parties exchanged in which Mr. Hurston was informed that Mr. Anzo did not own the Lake House and only jointly owned the Condo with his wife. Mr. Anzo contends Mr. Hurston's knowledge of such inaccuracies is a red flag that should have alerted Mr. Hurston to other potential inaccuracies in the Financial Statement. "The existence of a 'red flag' which would put a reasonably prudent

---

[16] Notably, some courts also consider whether it was the creditor or the debtor who solicited the extension of credit as a factor in determining reasonableness. *See, e.g.*, *In re Martin*, 299 B.R. 234, 241 (Bankr. C.D. Ill. 2003); *In re Larrieu*, 230 B.R. 256, 266 (Bankr. E.D. Penn. 1999); *In re Eckert*, 221 B.R. 40, 44-45 (Bankr. S.D. Fla. 1998). Here, it was Mr. Hurston who solicited Mr. Anzo about investing money in the Marina, as opposed to the more common situation where the debtor solicits money from the creditor.

person on notice that the information contained in the financial statement may not be accurate is a key factor in the reasonable reliance test under § 523(a)(2)(B)." *Bailey v. Turner* (*In re Turner*), 358 B.R. 422, 427 (Bankr. N.D. Okla. 2006). A creditor cannot ignore red flags that suggest inaccuracies, and should undertake at least some minimal investigation as to the representations contained in a financial statement with red flags. *See Bank of Commerce v. Smith* (*In re Smith*), 278 B.R. 532, 538-39 (Bankr. N.D. Okla. 2002) (concluding no reasonable reliance when bank failed to undertake even minimal investigation of representations contained in financial statement when incomplete financial statement contained information which called into question the accuracy of information); *Teates v. Kuranda* (*In re Kuranda*), 122 B.R. 264, 269 (Bankr. E.D. Va. 1990) ("A creditor cannot ignore 'red flags' and expect to benefit from nondischargeability."). When red flags exist that indicate a financial statement lacks accuracy, it creates a necessity for additional minimal investigation by the creditor. *Fahey Bank v. Benton* (*In re Benton*), 367 B.R. 592, 599 (Bankr. S.D. Ohio 2006); *but see In re Norris*, 70 F.3d 27, 30 (5th Cir. 1995) (finding that the only obvious substantial error, an overestimation of the value of real estate which was the bank's collateral of which the bank was already aware was not such a red flag as to invoke a duty to investigate and the rest of the financial statement was adequately supported by the record); *Young v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA* (*In re Young*), 995 F.2d 547, 549 (5th Cir. 1993) (existence of whiteouts and handwritten additions to a financial statement which was typed was not such a red flag to invoke a duty to investigate). Even if a creditor lacks the resources that a banking institution may have, there still remains the duty to verify the information if there are red flags. *Beneficial N.Y. Inc. v. Bossard* (*In re Bossard*), 74 B.R. 730, 736 (Bankr. N.D.N.Y. 1987) ("Yet even if a more relaxed process is justified, it would not allow the Plaintiff to blindly rely on any information….").

A red flag is a "glaring inconsistency" known to the creditor. *Insouth Bank v. Michael* (*In re Michael*), 265 B.R. 593, 600 (Bankr. W.D. Tenn. 2001) (finding grossly overstated income, failure to list any expenses or personal property, and creditor's actual knowledge of debtor's inability to pay obligations constituted red flags). A creditor also has little or no basis to trust a financial statement from a debtor with whom he has not conducted business before. *Lease Corp. of Am. v. Harloff* (*In re Harloff*), 272 B.R. 496, 500 (Bankr. M.D. Fla. 2001). The existence of one red flag may be sufficient to establish that a reasonably prudent person would have been on notice that the information may not be accurate. *In re Turner*, 358 B.R. at 427 (finding the valuation of the debtor's interest was a sufficient red flag that required further inquiry).

After considering all of the evidence, including the documents and testimony, credibility and demeanor of the witnesses, the Court finds that Mr. Hurston neither actually nor reasonably relied on the Financial Statement.

As more fully set forth in the discussion that follows, it is apparent to the Court that Mr. Hurston did not actually rely on the Financial Statement to renew the loan for the following reasons: (1) the initial advance of money was made on the initiative of Mr. Hurston without either a guaranty or any meaningful due diligence so it is not credible under the facts and circumstances of this case that Mr. Hurston relied on the Financial Statement to merely extend the loan, particularly when each extension provided him with benefits and Mr. Anzo told him neither he nor LaPrade's could pay; (2) both Mr. Hurston and his lawyer testified that the reason the loan was extended was so Mr. Hurston could get a "real note and guaranty;" (3) the failure to do any investigation of the Financial Statement, under the circumstances of this case, is inconsistent with the conduct of a person who was actually relying on it;[17] and (4) Mr. Hurston

---

[17] With respect to Mr. Hurston's failure to do any investigation into the *bona fides* of the Financial Statement, the Court is not making any *per se* rule that investigation is always required or what level is required, but

was told that the only way he was going to get paid was to extend the loan so LaPrade's could obtain a loan on the Marina, so he continued to extend the loan in exchange for better terms and some payments in the interim.

The evidence supporting Mr. Hurston's actual reliance on the Financial Statement is his mere testimony that he relied on it and his vague statement that he wanted "what other lenders get." It was Mr. Anzo who actually offered to provide him with a financial statement in consideration for an extension if the bank loan did not close. The evidence contrary to the allegation that he actually relied on the Financial Statement was his actual conduct, which this Court finds to be a better indicator of the truth. Mr. Hurston made no effort to verify any of the information on the Financial Statement when he not only had no reason to believe any of it, but actually knew it was materially inaccurate. Had he made some effort to investigate the truth of the Financial Statement, it would have indicated to the Court that he was actually relying on it. But he made no such effort. The only conclusion that can be drawn under the circumstances of this case was that he was not actually relying on the Financial Statement to extend the loan.

Even if this Court were to find that Mr. Hurston actually relied on the Financial Statement, the Court would conclude that under the totality of the circumstances in this case, his reliance was not reasonable for the following reasons: (1) Mr. Hurston should have been more cautious because he did not have an established lending procedure to follow in renewing the loan application; (2) Mr. Hurston did not verify the Financial Statement through readily available sources; (3) even minimal investigation by Mr. Hurston would have revealed additional inaccuracies of Mr. Anzo's representations; (4) Mr. Hurston did not have a previous or close

---

rather applied that consideration to the facts of this case, which involved a $400,000 commercial loan to a borrower with whom the lender had no prior positive experience and a Financial Statement which the lender knew had material inaccuracies.

personal relationship or friendship with Mr. Anzo, but rather strictly a business relationship at the time of the extensions and one that was chilly at best; (4) the Financial Statement contained many "red flags" that should have alerted Mr. Hurston to inaccuracies; and (5) the debt was initially incurred for commercial reasons on Mr. Hurston's initiative with no documented financial information. All of these factors show that Mr. Hurston's reliance on the Financial Statement was neither actual nor reasonable.

So what red flags were there, if any, in the Financial Statement?  First, Mr. Hurston insisted on getting paid, but was told by Mr. Anzo in January 2009 that "we are unable to pay you off until the loan gets completed."  That statement does not merely suggest illiquidity, but it admits it.  Mr. Hurston then received the Financial Statement prior to finalizing the extension, and the Financial Statement showed a net worth of more than $12,500,000 with debt of less than $3,000,000 and an asset to debt ratio of about 5:1!  Yet supposedly LaPrade's and Mr. Anzo did not have the ability to pay him.  How could that be, other than that either the Financial Statement was wrong or Mr. Anzo did not tell the truth that he could not pay?  At the very least, investigation of the Financial Statement was necessary to reconcile the two contrary statements.

Second, there were known material inaccuracies on the face of the Financial Statement. In October 2008, about a month after Lehman Brothers filed for bankruptcy and about one week after the President signed the TARP bill to shore up the country's financial markets allegedly to prevent their collapse, the parties exchanged the E-mails wherein Mr. Anzo specifically told Mr. Hurston that he did not own the Lake House, but rather his wife did, and that the Condo was jointly owned by he and his wife.   The E-mails were exchanged in October 2008 while the parties were negotiating an extension of the October 2007 Note. The Financial Statement was actually delivered in late January 2009 in connection with the January 2009 Note.

Contrary to the representations in the E-mails, the Financial Statement delivered to Mr. Hurston in January 2009 showed that Mr. Anzo was the sole owner of the Lake House and the Condo, which Mr. Hurston knew to be untrue based on the E-mails.   It also showed a net worth in excess of $12,500,000, despite the country's financial turmoil and Mr. Anzo's statement to Mr. Hurston that he could not pay him. There were certainly other red flags on the face of the Financial Statement, including the failure to list the contingent liability to Mr. Hurston, himself, and other substantial contingent obligations one would reasonably expect to be associated with the Marina, especially since Mr. Hurston knew about the secured debt on the Marina at that point.  By the time the Financial Statement was reaffirmed by Mr. Anzo in connection with the June 2009 Note, the country was in a deep recession, and the real estate and financial markets were destabilized and it was extremely difficult to finance or close a real estate or commercial transaction.   Based on Mr. Anzo's reaffirmation of the Financial Statement in connection with the June 2009 Note, Mr. Hurston asserts that he had no reason to question that Mr. Anzo's net worth was not adversely affected by the recession, despite the fact that so many people in the country had suffered a significant drop in the value of their portfolios.    Particularly given the economic situation the country was in at that time, the Court finds that the representation from Mr. Anzo, a marina owner/operator and owner of real estate, that his financial condition had not deteriorated during this time was not reasonable to rely upon and was another red flag that required further inquiry or is evidence that the Financial Statement was not actually relied upon in extending the note. *See In re Mansour*, No. 08-3096-dof, 2010 WL 3853151, at *8 (Bankr. E.D. Mich. Sept. 30, 2010) (noting the creditor should have been skeptical of values placed in a financial statement from August 2007 because of the general decline of real estate).

Because Mr. Hurston knew that Mr. Anzo did not own the Lake House and only owned half of the Condo and had mortgages of about $2,700,000, he acknowledged he was not relying

on the real estate disclosed in the Financial Statement for repayment, but rather on the stocks and bonds and the partnership interests disclosed on the Financial Statement.   Mr. Hurston testified that those interests, valued at more than $10,000,000 on the Financial Statement, made him comfortable that he could get paid the amounts owed him because the amount owed to him was such a small percentage of the amount of those assets.

To the contrary, however, a reasonable person, particularly knowing what Mr. Hurston knew, would have questioned, and consequently further investigated, both the ownership and the actual value of those assets on the Financial Statement if he intended to actually rely on them. First, with respect to the ownership of the assets listed on the Financial Statement, Mr. Hurston knew of material inaccuracies specifically with respect to the ownership of substantial assets.   It was not reasonable for him to assume the ownership of the other assets was correct, but quite to the contrary: a reasonable person intending to rely on the Financial Statement would have either (a) assumed that the ownership was also not correct or (b) at the very least investigated further. With respect to the value of the business interests, numerous red flags also existed.   For example, one red flag was the value of Mr. Anzo's interest in LaPrade's at $2,700,000.   This value was based on an appraisal[18] which even Mr. Hurston acknowledged was too high.   More importantly though, this value was particularly suspect given the difficult economic environment and because LaPrade's could not even repay Mr. Hurston and was unable to get refinancing that necessitated the repeated extensions of the loan from Mr. Hurston.   Basically, one red flag is how could Mr. Anzo's interest in La Prade's be worth almost $3,000,000 when it could neither pay Mr. Hurston nor get a loan?

Mr. Hurston testified that he relied on the value of Mr. Anzo's alleged interests in partnerships and privately held companies because of their liquidity, but there was no reasonable

---

[18] See footnote 6.

21

basis for him to conclude that they had liquidity without doing some type of investigation into that fact.  It appeared to the Court that his basis that these investments were sufficiently liquid to pay his claim was that the partnerships or privately held companies had allegedly invested a lot of money into LaPrade's so they must have more money.  That was not a reasonable assumption to make, particularly in early 2009 in the middle of such a deep recession.  It would seem to the Court that the opposite assumption - that they were not liquid - would have been the more reasonable assumption to make at this time, particularly with respect to whether someone's interest in the company was sufficiently liquid to support a credit decision or, at the very least, necessitated further investigation if Mr. Hurston was actually relying on those assets for repayment.    Furthermore, it would not be reasonable to rely on an entity's liquidity when the reason for the extension of the maturity date is because more time was needed for the borrower to refinance the property because the obligors are not otherwise able to pay.  Mr. Anzo admitted as much before the loan was extended.  The need for an extension of time to pay was a red flag that liquidity was an issue because the obligors admitted they did not have the money to otherwise pay.[19]  Finally, if Mr. Hurston was actually relying on the liquidity of the companies in which Mr. Anzo allegedly had an interest to pay his claim, he should and could have easily confirmed their liquidity by requesting bank statements and also balance sheet and profit and loss statements.

Although the prior red flags are sufficient for the Court to find that any reliance on the Financial Statement was not reasonable, even more red flags existed.  Another red flag on the Financial Statement was the representation of the value of the interests in VMG and affiliates to

---

[19] The Court is not finding that all loan renewals are red flags.  The focus here is on the fact that the obligors told Mr. Hurston they needed the loan renewed because they did not have the liquidity to pay it off.  Lenders extend loans for many reasons, which sometimes include the desire to continue an otherwise positive lending relationship because they earn interest and fees. We do not have that here in this case: Mr. Hurston repeatedly expressed his desire to get paid off and Mr. Anzo kept telling him he could not do it.

be more than $5,650,000. Mr. Hurston knew from the Executive Investment Summary that he had seen on the Marina that affiliates of Vinings Marine Group ("VMG") had loaned or invested up to more than $7,000,000 in LaPrade's. Based on LaPrade's distressed situation, the value of these interests was dubious. A reasonable person would have questioned how VMG and its affiliates could pay Mr. Hurston if such a large part of the amount of their "value" was tied up in LaPrade's, which could not pay Mr. Hurston in the first place. Consequently, the vast majority of Mr. Anzo's alleged stated net worth on the Financial Statement was tied up, either directly or indirectly, in LaPrade's, an entity that did not have the ability to pay Mr. Hurston's debt to begin with. When the VMG-related assets are coupled with the stated value of Mr. Anzo's investment in LaPrade's of $2,700,000, the value of LaPrade's-related assets on the Financial Statement exceeded $8,350,000 of the $10,000,000 on the Financial Statement on which Mr. Hurston allegedly relied, leaving less than $1,650,000 of alleged net worth in other stocks, bonds and partnership interests in a terrible recession to cover the debt owed to him. But it does not stop there. Of that remaining $1,650,000 of alleged net worth, more than $1,030,000 was in partnership interests in which Mr. Anzo purportedly owned a minority interest and in five out of six of the entities he owned an interest of less than 15%. Under the facts of this case, which include known material inaccuracies as to the ownership and value of assets, as well as a terrible economic environment, a reasonable person would not assume that those minority interests in partnerships had the values assigned to them by Mr. Anzo or that they had the kind of liquidity that could satisfy a judgment. *See, e.g.*, *Green Bay Packaging, Inc. v. Oscarson* (*In re Oscarson*), 363 B.R. 542, 554 (Bankr. N.D. Ill. 2007) (finding that creditor did not actually or reasonably rely on financial statement when prudent credit manager would not give interest in company or personal property much weight because they were not liquid), *rev'd in part sub nom. Green Bay Packaging, Inc. v. Oscarson*, No. 07 C 2233, 2007 WL 3407108 (N.D. Ill. Nov. 7, 2007).

Accordingly, any reliance on the purported values of Mr. Anzo's alleged interests in these partnerships and privately held companies, whether or not minority interests, was not reasonable, but rather another red flag which required investigation into the basis for the values of these other interests if, in fact, they were assets being relied upon in extending the note.

Mr. Hurston argues a creditor should be able to assume the information on a financial statement is correct if the document is signed, and even if there is a red flag, it should not require a creditor to investigate every detail on the financial statement. *See Gerritsen Beach Invs. Ltd. et al. v. Jemal* (*In re Jemal*), 516 B.R. 238 (Bankr. E.D.N.Y. 2014); *Household Fin. Corp. v. Howard* (*In re Howard*), 73 B.R. 694 (Bankr. N.D. Ind. 1987). The problem with this argument is that the issue is not whether the creditor should generally be able to assume the information in a financial statement is accurate and whether "every" detail therein needs to be investigated, but rather whether the creditor's reliance on the financial statement was reasonable under the totality of the circumstances of the case. Differences exist between what reliance would be reasonable for a creditor who makes a $3,000 consumer loan versus a creditor who makes a $400,000 commercial loan.

In support of this argument, Mr. Hurston relies upon *In re Jemal* for the proposition that the reasonableness standard is a "low hurdle for a creditor to meet, and is intended as an obstacle only for creditors acting in bad faith." 516 B.R. at 246, quoting *In re Bonnanzio*, 91 F.3d 296, 305 (2nd Cir. 1996), which itself quoted from *In re Woolrum*, 979 F.2d 71, 76 (6th Cir. 1992), which quoted from *In re Martin*, 761 F.2d 1163, 1166 (6th Cir. 1985). *Martin* dealt with a mere $2,500 loan by a bank to an existing customer based on a financial statement showing a net worth of more than $100,000 where the bank also ran a credit report. 761 F.2d at 1166, 67. In *Woolrum*, the bank obtained a tax return and ran a credit report as part of an investigation of the debtor's financial statement, which additional information supported the information on the

financial statement.   979 F.2d at 72, 73.   The facts in *Bonnanzio* are unique to say the least, involving an unscrupulous accountant who placed the financially unsophisticated debtor into an investment she could not afford, and the matter was remanded to the bankruptcy court for further findings.   Regardless of whether the hurdle was high or low, the creditor in those cases cleared the hurdle because they at least conducted some investigation.

If the reasonableness standard is a low hurdle for the creditor to meet, this Court finds that Mr. Hurston did not even clear that hurdle because he did no investigation despite the red flags being waved to signal him to investigate.   If the standard set out in *Martin, Woolrum and Bonnanzio* is the focus is on the creditor's lack of bad faith - and this Court thinks it is not - that standard is neither correct nor is it the standard in the Eleventh Circuit.   In *In re Vann*, the Eleventh Circuit Court of Appeals concluded that "the requirement of reasonableness [is] a more stringent standard than justifiable reliance or actual reliance" and specifically contrasted that with the aforementioned language from *Martin.*   67 F.3d 277, 280 (11th Cir. 1995).   The Eleventh Circuit appropriately focused on the fact that "[r]easonable reliance connotes the use of the standard of an ordinary and average person."   *Id.*, citing *In re Kirsh*, 973 F.2d 1454, 1458 (9th Cir. 1992).   This generally accepted standard of the "ordinary and average person" to determine reasonableness is certainly not the same as a standard based on a creditor who merely does not act in bad faith.   Reasonableness requires more than that. This Court also thinks the Second and Sixth Circuits require more than that, as well, and the language used by them is merely a factor used in considering the totality of circumstances which they also all discuss to determine reasonableness.   *Martin, 761 F.2d* at 1166 ("Initially the Bankruptcy Court should make its determination of reasonableness considering all the facts and circumstances of the case"); *Woolrum,* 979 F.2d at 75 ("[w]hether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances."); *and Bonnanzio,* 91 F.3d

at 305 ("The reasonableness of reliance requires the fact finder to consider "the totality of the circumstances..."). The Eleventh Circuit cited with approval the standard of reasonableness set forth by the Tenth and Fifth Circuits. The Tenth Circuit held

> this standard of reasonableness places a responsibility upon the creditor to ensure that there exists some basis for relying upon the debtor's representations. Of course, the reasonableness of a creditor's reliance will be evaluated according to the particular facts and circumstances present in a given case.

*Vann*, 67 F.3d at 280, quoting *In re Mullet*, 817 F.2d 677, 679 (10th Cir. 1987).

Simply put, Mr. Hurston has not provided a reasonable basis to rely on Mr. Anzo's representations. The Fifth Circuit held that reasonable reliance would be ascertained by asking the following questions:

> whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any red flags that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Vann*, 67 F.3d at 280, quoting *In re Coston*, 991 F.2d 257, 261 (5th Cir. 1993).

Similarly, each of these factors is answered in Mr. Anzo's favor and against Mr. Hurston.

With respect to the decision in *Jemal*, it is clear that the court there focused heavily on the creditor's lack of bad faith, based on the comment in *Bonnanzio*. In *Jemal*, three creditors invested $5.5 million in a project managed by Mr. Jemal, which investment gave them the majority interest in the company. Mr. Jemal persuaded them to sell their interests to him in exchange for promissory notes so he could allegedly refinance the property. The creditors required a personal financial statement before approving the transaction, had their respective boards approve the transaction based on the ability to repay shown in the financial statement and they discussed the transaction with a senior bank officer who was a friend of theirs who

26

introduced them to Mr. Jemal.  Unlike the facts presented in this case, *Jemal* involved a financial statement which the court found did not contain red flags to prompt further investigation. *Id.* at 247. Without any red flags, coupled with the representations from the bank officer, the court found the financial statement did not require further investigation and therefore the reasonableness burden was satisfied. *Id.*  The financial statement in that case showed about $31,000,000 of marketable blue chip securities, including Google, Microsoft, Intel and Halliburton.  The only brokerage statements attached showed that $14,000,000, less than half, were held in custodial accounts for the benefit of the Jemals' children.  *Id.* at 248. The court found that no additional investigation was required because this was not a red flag. The creditors followed their ordinary procedures and the court noted that the parties had an existing business relationship of a couple of years directly related to this same project, they discussed the matter with a third party who knew the Jemals and they had some brokerage statements that supported some of the items on the financial statement, such as the lack of dividend income.[20]  In fact, in *Jemal* there was no knowledge of the inaccuracies and the attached documents alerted the creditor of the debtor's children's interest in some of the stocks.  Here, however, there was prior

---

[20] Based on what this Court knows about the facts in *Jemal*, which is less than what the judge in that case knew because she had the benefit of the complete record and could assess the credibility of the witnesses,  this Court questions whether reliance on that financial statement was reasonable for a couple of reasons.  First, that financial statement showed no dividend income, and it is hard to believe that anyone could not have some substantial dividend income if they owned $17,000,000 of blue chip securities the Jemals alleged they had.  Even an average of a 1% dividend would produce income of $170,000 per year, yet the Jemals showed absolutely zero dividend income. The court in *Jemal*, however, did find that this was consistent with the brokerage statements of the custodial accounts attached to the financial statement which showed estimated dividends of $0 from the $14,000,000 of securities in the custodial accounts, but this Court would be surprised if any brokerage house would undertake the liability of projecting dividends.  But the attachment of these custodial account statements to the financial statement in that case leads to the second concern.  This Court thinks it is odd for a debtor to attach to a financial statement an account statement for an account he does not own to the exclusion of the accounts he allegedly owns.  It would seem to this Court that a reasonably prudent person would have requested the brokerage statement for the non-custodial securities accounts owned by the debtors if they were intending to rely upon them for repayment.  But because the *Jemal* court was focused on the creditors' lack of bad faith, in addition to the pre-existing business relationship between the parties and the creditors did do some other, albeit minor, investigation and did follow their standard procedures, that court found the reliance was reasonable.   Other than the lack of bad faith, those are facts the creditors there had in their favor which Mr. Hurston does not have in his favor here.

knowledge of Mr. Anzo's material inaccuracies regarding ownership of assets with no supplemental information attached to the Financial Statement.

Mr. Hurston also relied on *Webster Bank, Nat'l Ass'n v. Contos* (*In re Contos*), 417 B.R. 557 (Bankr. N.D. Ill. 2009). In *Contos*, the court relied heavily on the fact that the parties had a prior business relationship. *Id.* at 567. Based on this relationship, the court determined the parties satisfactory course of dealing in the prior *thirty seven* loans "lulled [the creditor] into a false sense of security in relying on the [d]ebtors' representations that their income was substantially increased," and ultimately found that, based on the totality of the circumstances, the creditor's reliance on the financial statement was reasonable because there were no red flags. *Id.* In the present matter before the Court, Mr. Hurston and Mr. Anzo did not have a prior relationship. This was the first time the two engaged in any real business together. Mr. Hurston contends that there was no reason to not trust Mr. Anzo. The case law does not support Mr. Hurston's contention but rather the opposite: a creditor's ability to reasonably rely on a borrower's representations evolves over time and does not exist from the beginning of a new relationship. Furthermore, the facts of this case show that during their brief business relationship, Mr. Hurston developed a distrust of Mr. Anzo based on him feeling he was being "jerked around."  Mr. Hurston should have also been concerned with Mr. Anzo's inability to repay and his continued requests for extensions.

Mr. Hurston also relied upon *Master Fin., Inc. v. DeJulio* (*In re DeJulio*), 322 B.R. 456 (Bankr. M.D. Fla. 2005). In *DeJulio*, the debtor claimed that the creditor did not reasonably rely on a financial statement because the alleged substantial salary disclosed therein for an "administrative assistant" was a red flag. *Id.* at 462-63. The court was unpersuaded and found that the salary alone was not a sufficient red flag to require further investigation and that the creditor's actions conformed to industry standards. *Id.* at 463. To the contrary, the Financial

Statement before this Court contained more than one red flag.  The multiple red flags should have caused Mr. Hurston to proceed further with caution and investigate the Financial Statement if he truly intended to rely on it.

Finally, Mr. Hurston argues that *Norris v. First Nat'l Bank in Luling* (*In re Norris*), 70 F.3d 27 (5th Cir. 1995), supports his contention that further investigation was not necessary. In *Norris*, the debtor maintained that the financial statement contained blatant errors that should have led a reasonable person to question the information. *Id.* at 30. The error known by the bank in that case was an overestimation of the value of a particular piece of real estate that was the bank's collateral which the debtor contended should have caused the bank to question his falsely reported "cash flow surplus." *Id.* The Court of Appeals agreed with the bankruptcy court that the overestimation of value was not a red flag because the creditor was aware of the circumstances surrounding its collateral. *Id.* In *Norris*, the loan at issue had been renewed annually several times and the bank required submission of a balance sheet, income statement and most recent tax return prior to every renewal.  The loan was renewed near the end of every year.  The materially false statement on the last financial statement was that the debtor, a doctor, had a "cash flow surplus" of more than $45,000 at the time of the renewal.  Apparently, this amount must have been reasonably consistent with the documents submitted because that alleged surplus was not considered a red flag.[21]  During the current year, the debtor and his wife separated and had financial problems, so the alleged surplus did not actually exist at the time the financial statement was provided and the loan was renewed.  Therefore, the bank in *Norris* had a prior credit history with the debtor and also had his most recent tax return to support its underwriting.  In Mr. Hurston's case, he had no positive history with Mr. Anzo and he did no investigation at all.

---

[21] Because the loan was renewed near the end of the year, the prior year's statements and the most recent tax return would have been for the prior calendar year, which was a period almost a whole year before the loan was renewed.

Basically in *Norris*, the debtor argued that the bank should not have relied on the "cash flow surplus" on his financial statement because the bank knew he misstated the value of his house, even though the bank had prior tax returns and income statements that apparently did not create any red flags regarding this "cash flow surplus." The inaccuracy of the value of the house and the alleged cash flow surplus were simply not related. Here, however, not only did the misrepresentations on the Financial Statement known to Mr. Hurston concern the ownership of real estate, but so did the other major misrepresentations of which Mr. Hurston is now primarily complaining, that being the misrepresentation of the ownership of other assets. This Court cannot find that it was reasonable for Mr. Hurston, who had no positive credit experiences with Mr. Anzo, to rely on the statement of ownership of assets in the Financial Statement because the Financial Statement contained known inaccuracies regarding the ownership of property and he did no investigation nor requested any documents to support his assumption that the representations as to ownership of the other assets in the Financial Statement was true.

Mr. Hurston contends that he had no reason not to believe Mr. Anzo with respect to the representations of his net worth on the Financial Statement. The evidence presented to the Court is contrary to that, though. Mr. Hurston and Mr. Anzo had no prior business dealings before the October 2007 Note. While Mr. Hurston alleges that Mr. Anzo did not give him a reason not to trust him, a reasonable person would have actually been more cautious in a transaction involving a new relationship. *See, e.g.*, *In re Harloff*, 272 B.R. at 500 ("[S]ince [Creditor] and Debtor did not have an existing relationship prior to these Leases, [Creditor] had even more reason to investigate further rather than relying solely on the Lease Application.").

In addition to their lack of a business or personal relationship prior to the October 2007 Note, the relationship between Mr. Hurston and Mr. Anzo after the October 2007 Note was signed was not positive. For example, in September of 2008, before the October 2007 Note was

renewed, Mr. Hurston felt that he was not told the truth about the Marina being "free and clear" and that he was being ignored and "jerked around."  The representations of LaPrade's debt structure in the two different Executive Investment Summaries were also substantially different. When those kind of feelings in that situation are followed up with the receipt of a Financial Statement which contains known material inaccuracies, a reasonable person would not rely on that Financial Statement, but would investigate the truth and basis for the remainder of the representations in it if he was, in fact, intending to rely on its contents as part of a credit decision.

Mr. Hurston argues that his reliance was reasonable because of his interactions with Mr. Anzo, because he claims that Mr. Anzo lived a "wealthy, lavish lifestyle," and because he reviewed the Financial Statement carefully and it was consistent with Mr. Anzo's prior representations.  *See Posillico v. Bratcher* (*In re Bratcher*), 289 B.R. 205, 215 (Bankr. M.D. Fla. 2003) (holding reliance was reasonable, in part because the debtor had a good reputation in the community and had a wealthy family with nice assets); *see also Davenport v. Frontier Bank* (*In re Davenport*), 508 F. App'x 937, 938 (11th Cir. 2013) (unpublished) (finding of reasonable reliance not clearly erroneous when, among other things, creditor took into account debtor's education, job, and family's reputation in the community). The Court has previously addressed the interactions between the parties, which it found to be negative.  It also finds the assertion made by Mr. Hurston regarding Mr. Anzo's lifestyle is not supported by the evidence, including Mr. Anzo's testimony. Mr. Anzo drove cars that were between three and six years old and the only known asset of value associated with his alleged lifestyle was the Lake House, which Mr. Anzo had previously told Mr. Hurston was owned by Mr. Anzo's wife.  To the extent Mr. Anzo did maintain a nice lifestyle, it was not sufficient to make reliance on the Financial Statement reasonable given all of the other red flags.

31

In *Howard*, also cited by Mr. Hurston, the court relied heavily upon the factor of standard practices: departure from custom could lead to a finding of unreasonableness if following the standard practices would have revealed important information. 73 B.R. at 707.  But *Howard* involved a consumer loan of only about $3,000.  The debtor's financial statement there only listed debts of $7,150 to two creditors.  As it turns out, the debtor at that time had debts to several other creditors of at least about another $20,000, and possibly more than $60,000, which were not of the type that would appear on a typical consumer credit report.  The court there did not find the debtor's explanation for omitting at least $20,000 of these creditors to be credible. The court found that the reliance was reasonable because there were no red flags prompting additional investigation, and the alleged misrepresentations could not be ascertained through normal credit-check procedures (investigating employment, background, outstanding obligations, and credit record, all of which the creditor did). *Id.* at 710. Without any red flags, the creditor was entitled to rely on the information provided.   Furthermore, like the small loan in *Martin* of only $2,500, it is hard for a creditor to financially justify spending more time and expense on investigating a debtor for a $3,000 loan than what the creditors did in those cases, thus leading to the conclusion that reliance was reasonable under the circumstances in those cases.

Unlike *Jemal* and *Howard* and the other cases relied upon by Mr. Hurston, the Financial Statement that Mr. Anzo provided contained numerous red flags, all of which related to Mr. Anzo's ownership of assets and financial wherewithal, and the loan amount justified investigation. The actual and reasonable reliance requirement is not as easily satisfied as Mr. Hurston may allege - because of the red flags, lack of a positive prior relationship and the amount of the loan.   A reasonable person similarly situated to Mr. Hurston would have conducted further investigation into Mr. Anzo's finances. The Financial Statement could have easily been compared against tax returns, and their supporting schedules and K-1's, and bank

account statements. Mr. Hurston could have verified the information in the Financial Statement if he had asked for a few simple documents. Mr. Hurston's argument that there was no reason to further investigate the Financial Statement is without merit.

Mr. Hurston asserts that most of the assets contained in the Financial Statement were assets that were not easily verifiable and that he was not concerned with the ownership of the Lake House and Condo in light of Mr. Anzo's representation that the bulk of his assets were not personal residences. It is true that ownership of interests in privately held companies cannot be verified on a public record like real estate as asserted by Mr. Hurston. But it was not reasonable for Mr. Hurston to assume that Mr. Anzo accurately stated that he owned those interests when he knew the Financial Statement incorrectly reported Mr. Anzo's ownership interest in the Lake House and Condo and he believed Mr. Anzo previously misrepresented to him that the Marina was "free and clear." In fact, it would have been more reasonable to assume the exact opposite to be true in such a situation and ask for more information, such as requesting tax returns with schedules and K-1's that would have showed who, if anyone, owned interests in these privately held companies. The tax returns and bank statements of the companies and partnerships would have had valuable information in them, as well, such as their cash balances and income, key determinants of liquidity on which Mr. Huston claimed to be relying. For example, a tax return would have shown the household income and income from wages, dividends and distributions, as well as other types of business income. If the income was, hypothetically, only $100,000 or less, it could be a red flag for someone to allege to have a net worth of more than $12,500,000, but only have that much income. At the very least, when Mr. Hurston received the knowingly inaccurate Financial Statement, he should have raised the issue with Mr. Anzo and received a written verification at that time that Mr. Anzo did or did not own the interests in the stocks, bonds and partnerships or he should have requested a proper financial statement because that is

what an ordinary person would have done.  But he did not even do that.  The fact that Mr. Hurston received a general reaffirmation of the Financial Statement buried in a multi-page guaranty agreement from Mr. Anzo six months later does not address the specific problem raised by the known inaccuracies in the Financial Statement.  In fact, as previously discussed, the general reaffirmation of the Financial Statement six months later during those economic conditions only raised another red flag because a reasonable person would have assumed that the net worth of a person heavily invested in real estate and marinas would have declined during that time.

Even if Mr. Hurston had only asked for tax returns to verify the information without the schedules, it would have been a factor in his favor because by making such an inquiry it would have shown that he was actually relying on it by making some attempt to verify it. *See Massey-Ferguson Credit Corp. v. Archer* (*Matter of Archer*), 55 B.R. 174, 178 (Bankr. M.D. Ga. 1985) (finding reliance was reasonable where creditor looked first to the financial statement but also contacted local credit bureau and the Farmers Home Administration to inquire about debtor); *see also USAmeriBank v. Strength* (*In re Strength*), No. 16-3022-WRS, 2016 WL 4204084, at *2 (Bankr. M.D. Ala. Aug. 8, 2016) (finding that failure to conduct investigation coupled with inadequate explanation for failure was not reasonable).  Simply put, by making even a minimal investigation to verify a financial statement, a creditor is demonstrating that it is relying on the information in it.  When no investigation is done, absent some other circumstances, it certainly gives the appearance that the creditor is not actually relying on the financial statement in extending credit or renewing a loan.

It is important to note that Mr. Hurston made the initial loan to LaPrade's without a guaranty or any material due diligence or supporting financial documentation.  The loan was then renewed with a skeletal guaranty but without any material due diligence or supporting

34

Case 15-02026-jrs   Doc 73   Filed 12/27/16   Entered 12/27/16 07:24:38   Desc Main
Document       Page 35 of 38

financial documentation.  For this and the other reasons discussed herein, the Court does not find it credible that the further renewal of this loan was based on the information in the Financial Statement which he knew contained material inaccuracies.  Further evidence of Mr. Hurston's failure to rely on the Financial Statement with respect to his decision to extend the January 2009 Note was that he did not think it was important enough to advise his lawyer of the material mistakes in the Financial Statement which he knew about.  Perhaps most importantly and conclusively, both Mr. Hurston and his lawyer testified that the January 2009 Note was extended so Mr. Hurston could get a more properly documented note and guaranty.  The January 2009 Note, which was merely endorsed by Mr. Anzo as a "Guarantor," may have technically been enforceable, but by renewing the January 2009 Note with better documentation, Mr. Hurston put himself in a position where he could easily obtain a summary judgment if he had to enforce it instead of suing on a note and guaranty that could have been a challenge to enforce.  In the interim, Mr. Hurston also received a cash payment of $11,562.55 upon the signing of the June 2009 Note, plus the promise of monthly interest payments.  Prior to that, Mr. Anzo wrote a letter to Mr. Hurston saying there was no other viable option to repay the note and proposed renewal terms "to avoid litigation."  It appears that Mr. Hurston believed him so he renewed the note.  This extension under those terms was a reasonable course of action even if the Financial Statement had showed a negative net worth because Mr. Hurston had already lent the money, the extension did not hurt his ability to get repaid and it provided him with some benefits.

Additionally, Mr. Hurston contends that he was not a sophisticated lender, but rather just an individual who wanted equity in a property he always admired. This argument fails to give enough weight to the fact that Mr. Hurston had years of experience working in Coca Cola's Corporate Tax Department and even served as its Director of Corporate Real Estate for six years. The creditor's knowledge and experience is relevant in determining whether the creditor's

reliance was reasonable. *Neilson v. Straight-Out Promotions, LLC et al.* (*In re Tyson*), No. 05-02210 (ALG), 2011 WL 1841881, at *4 (Bankr. S.D.N.Y. May 13, 2011); *W.E. Dvais Co. v. Medow* (*In re Medow*), 26 B.R. 305, 307-08 (Bankr. S.D. Fla. 1982). Mr. Hurston's experience, however, indicates he is more sophisticated in business matters than the average individual.  His business experience was cultivated as a senior manager at one of the largest and most successful corporations in the world, yet he did not even want to retain a lawyer in this $400,000 transaction in which he really wanted to have equity instead of a loan and did practically no due diligence because he did not think its size warranted the cost.   An ordinary person would not have shared that attitude and it reflects on his approach to this entire loan transaction and his renewals in that he was not actually relying on the Financial Statement in extending this loan.  It appears to the Court that the reason the loans were extended for short periods of time was that each and every extension gave Mr. Hurston some benefit he had not received before while LaPrade's was trying to refinance the Marina and pay him off because Mr. Anzo told him he could not otherwise pay him and he knew that was a reasonable option under the circumstances.  In the first extension, Mr. Hurston received an extremely basic guaranty from Mr. Anzo plus the interest rate was raised from 8% to 12% with a default interest rate of 15%.  The second extension increased the interest rate from 12% to 15% and also provided a deadline by which Mr. Hurston would receive the Option Agreement or the note could be accelerated sooner.  The final extension not only provided Mr. Hurston with a more legally solid note and guaranty, but it also added a provision for default interest rate of 18% and he actually received a cash payment of $11,562.55 upon its execution plus a requirement of monthly interest payments rather than merely having interest accruing during the term of note as with all of the prior notes.

Mr. Hurston argues that it is not within the purview of this Court to second guess a creditor's decision to lend money. *In re Contos*, 417 B.R. at 566. While this is an accurate

36

statement, its purpose is to ensure the Court does not "subjective[ly] evaluat[e] and judg[e] the creditor's lending policy and practices." *Id.*  The Court is not second guessing Mr. Hurston's decision to extend the note, and has previously noted that his decision to do so was a reasonable course of action even if the Financial Statement had showed a negative net worth because he had already lent the money, the extension did not hurt his ability to get repaid and it provided him with some benefits.  This Court, however, must determine whether the creditor's reliance on the financial statement was reasonable under the circumstances. *Id.*

Accordingly, in looking at the totality of the circumstances and reviewing the factors discussed earlier, the Court finds that: (1) Mr. Hurston did not have an established lending procedure to follow in renewing the loan application; (2) Mr. Hurston did not verify the financial statements through readily available sources; (3) even minimal investigation by Mr. Hurston would have revealed the inaccuracies of Mr. Anzo's representations; (4) Mr. Hurston did not have a previous or close personal relationship or friendship with Mr. Anzo, but rather strictly a business relationship at the time of the extensions and one that was chilly at best; (4) the Financial Statement contained many "red flags" that should have alerted Mr. Hurston to inaccuracies; and (5) the debt was initially incurred for commercial reasons on Mr. Hurston's initiative with no documented financial information. All of these factors, except possibly the first one,[22] favor Mr. Anzo and show that Mr. Hurston's reliance on the Financial Statement was neither actual nor reasonable.

Based on the record before the Court, the Court finds that Mr. Hurston did not actually rely on the Financial Statement or, if he did actually rely on it, his reliance was not reasonable.

---

[22] It certainly could be argued that by not having any established lending procedures, a reasonable person would have been more cautious, which would favor Mr. Anzo on all of the factors.

**2. Intent to Deceive**

Because the Court has concluded that Mr. Hurston has failed to meet his burden that he actually relied on the Financial Statement or that his reliance on the Financial Statement was reasonable, the Court does not need to rule on the issue of whether Mr. Anzo delivered the Financial Statement to Mr. Hurston with the intent to deceive him.

**Conclusion**

Accordingly, for the reasons stated herein, it is hereby

ORDERED that Mr. Hurston's Complaint to determine that the debt owed to him by Mr. Anzo is non-dischargeable is DENIED.

[END OF DOCUMENT]
